# STATE OF MICHIGAN

# COURT OF APPEALS

ANDREA IRWIN, as Next Friend of E.I., a minor,

       Plaintiff-Appellees,

v

COVENANT MEDICAL CENTER, INC doing business as COVENANT HEALTHCARE,

       Defendant-Appellants,

and

DEBORAH L RUSSELL, MD, RADHA CHERUKURI MD, DANIEL J WECHTER, MD and MATERNAL-FETAL MEDICINE, PC,

       Defendants.

UNPUBLISHED
November 1, 2018

No. 338395
Saginaw Circuit Court
LC No. 15-026706-NH

Before: BECKERING, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

This medical malpractice case arises out of the minor plaintiff's birth at defendant Covenant Medical Center ("Covenant") in February 2005. Covenant appeals by leave granted[1] those portions of the trial court's order denying its motion for summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact) and from a second order denying co-defendant Deborah L. Russell, M.D.'s, motion for summary disposition based on laches, in which Covenant had concurred. For the reasons set forth below, we reverse the trial court's denial of Covenant's motion for summary disposition and remand for further proceedings with respect to the remaining defendant in this matter, Dr. Russell.

---

[1] *Evan Irwin v Covenant Med Ctr. Inc.*, unpublished order of the Court of Appeals, entered November 29, 2017 (Docket No. 338395).

-1-

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff's mother, Andrea Irwin, received both prenatal and labor and delivery care from Dr. Russell, and it is undisputed that Dr. Russell was an independent staff physician who was not employed by Covenant. On the morning of February 8, 2005, Andrea arrived at Covenant to undergo a planned induction of labor for a post-date delivery. Andrea's labor and delivery nurse at Covenant was Heather Welz, R.N. Nurse Welz's duties included keeping contemporaneous, computerized notes of the events taking place in Andrea's labor and delivery room. There were also three OB/GYN resident physicians involved in Andrea's care, being Reuben Adegoke, M.D., Michelle Liamidi, M.D., and Raj Rathee, M.D.

Plaintiff's allegations of malpractice focus on events in his care beginning at 17:46[2], when Welz recorded in the electronic record, "VISIT DR. RUSSELL." The electronic record documents that at 18:33:39, Andrea's membranes were artificially ruptured (AROM),[3] resulting in a normal quantity of clear fluid. The entry at 18:34:09 is, "FHTs [fetal heart tones] 150s. IUPC[4] INSERTED. BRIGHT RED BLOOD RETURN IN IUPC TUBING. CHANGED TO LL [left lateral] POSITION." The entry for 18:37:05 reads, "BLOOD DRIPPING FROM VAGINA. 02 APPLIED PER TIGHT FACE MASK. IV HOOKED UP AND BOLUS STARTED. HELP CALLED TO ROOM.[5] CHANGED TO RL [right lateral] POSITION." The note at 18:38:15 states, "FHT's 70's. UNABLE TO GET GOOD FHT TRACE. DR. RUSSELL IN ROOM." And at 18:39:42: "CODE PINK[6] CALLED PER DR. RUSSELL. OFF TO OR. FHT'S 50's." Andrea was rushed to the operating room for an emergency cesarean section. Plaintiff was delivered approximately 10 minutes later. Observed during the cesarean section was a "succenturiate lobe[7] . . . low in the uterine cavity[,]" and "vessels traversing the membranes from the main portion of the placenta to the satellite lobe."

Plaintiff was transported to the neonatal intensive care unit (NICU). He required blood and platelet transfusions, and he developed seizures that required treatment with phenobarbital. His diagnoses four days after birth included "hypoxic ischemic encephalopathy," a condition

---

[2] The medical records charted the care at issue in military time.

[3] There are conflicting entries in the medical records regarding whether rupture of the membranes was artificial or spontaneous

[4] An IUPC is an intrauterine pressure catheter, a device inserted into the amniotic space during labor to measure the strength of uterine contractions.

[5] Welz testified that this entry signifies that she hit the patient's call light button, which is typically answered by a nurse or nurse's aide. She explained that if fetal heart tones (FHT) are down, they always summon extra nurses.

[6] Code pink indicates the need for an emergency cesarean section. Nurse Welz explained at her deposition: "It's a page overhead that calls for anesthesia, neonatal, all hands on deck basically to get the patient back to the operating room."

[7] Also called an "accessory" or "satellite" lobe.

indicating brain damage due to a lack of oxygen to the brain. A CT scan performed nine days after birth was indicative of a left middle cerebral artery stroke. According to plaintiff, injuries from his birth include brain damage, cerebral palsy, and significant motor and mental delays, and he will need lifelong attendant care.

A notice of intent to file a claim was issued in November 2014, and on May 22, 2015, plaintiff filed the instant medical malpractice action by and through his mother as his Next Friend. Relevant to the instant appeal, plaintiff alleged that, based on Andrea's history of placenta previa, the defendants knew or should have known that placement of internal monitoring devices, such as an IUPC, was contraindicated, was unreasonably dangerous to the mother and to him, and should have been avoided. Plaintiff further alleged that because the form, shape, and location of the placenta impaired the prospects of a safe vaginal delivery, delivery should have been by elective cesarean section. Use of the IUPC resulted in "acute, severe bleeding which caused hypoxia/ischemia and acute brain damage." Plaintiff named as co-defendants: Covenant[8], Covenant Healthcare Partners, Inc., Covenant Healthcare Foundation, and Covenant Healthcare System; Dr. Russell individually, Deborah Russell, M.D., P.C./P.L.L.C. and "Deborah L. Russell, M.D. and Paul A. Meyer, P.C."; maternal-fetal medicine (MFM) specialists Radha Cherukuri, M.D., Daniel J. Wechter, M.D., and Maternal-Fetal Medicine, P.C. At the time of this appeal, the only defendants remaining are Covenant and Dr. Russell.[9]

The parties set about deposing the witnesses.[10] Plaintiff's medical expert, Jeffrey Soffer, M.D., testified that given Andrea's prenatal condition, Dr. Russell should have delivered plaintiff by elective cesarean section, rather than induction, and that in the face of an induction, although an IUPC typically would be used during labor, in this instance its use breached the applicable standard of care. Dr. Soffer explained that Andrea's placenta had an accessory lobe and that exposed fetal vessels extended between the main body of the placenta and its accessory lobe.

---

[8] Plaintiff sought to hold Covenant vicariously liable for the alleged malpractice of the hospital's nurses (specifically, Nurse Welz), and the three OB/GYN residents. It is undisputed that none of the residents were employed by Covenant, but rather, by Synergy Medical Education Alliance, which is not a defendant in this case.

[9] A stipulated order was entered in August 2015 dismissing with prejudice Deborah Russell, M.D., P.C./P.L.L.C. and "Deborah L. Russell, M.D. and Paul A. Meyer, P.C." It appears that these professional corporations did not exist at the time of the alleged negligence in 2005. In March 2016, the trial court entered an order dismissing Covenant Healthcare Partners, Inc., Covenant Healthcare Foundation, and Covenant Healthcare System. In April 2017, the trial court entered an order striking the testimony of plaintiff's MFM expert because he was not qualified under Michigan law to testify as an expert, denying plaintiff's motion to name a new MFM expert, and dismissing the MFM defendants, Drs. Cherukuri and Wechter and Maternal-Fetal Medicine, P.C.

[10] To avoid redundancy, lay witness testimony is addressed in the sections below where the testimony is relevant to the issues raised by Covenant.

The main lobe was posterior and the accessory lobe was anterior, which meant that the communicating vessels had to traverse the cervix, a condition Dr. Soffer identified as vasa previa. Andrea was not diagnosed with a vasa previa prior to plaintiff's birth. Dr. Soffer acknowledged that none of the ultrasound reports described vessels traversing the cervical opening; however, he insisted that this was because Andrea's vasa previa was not typical, but of the kind where the vessels traverse the cervix two to four centimeters above the opening, and he opined that the vessels would have been visible on a color Doppler image, had one been performed.

Although he could not cite a specific medical article in support of his position, Dr. Soffer testified that "Everyone in the medical community accepts the fact that if you have a vasa previa, you don't use an IUPC, and you don't allow labor." Dr. Soffer acknowledged that use of an IUPC is called for when inducing labor in order to avoid overstimulation of the uterus and the resultant danger to both mother and baby. But according to Dr. Soffer, the presence of a vasa previa created a risk for bleeding, and use of an IUPC was contraindicated because of the high risk that threading the catheter up into the uterus could perforate the communicating vessels. And where there is a vasa previa, because the rupture of the membranes that accompanies labor might also rupture the communicating vessels, the avoidance of labor through early delivery by elective cesarean section is highly recommended.

Dr. Soffer testified that, most likely, insertion of the IUPC ruptured the communicating vessels and caused the massive bleeding that followed immediately upon insertion of the device, but he could not rule out that rupture of the membranes caused the communicating vessels to rupture. In any event, the bleeding caused plaintiff to suffer hypoxia and "probably anemia," which caused plaintiff's middle cerebral artery stroke. Dr. Soffer agreed that up until the hemorrhage occurred, plaintiff would have been born "neurologically and physiologically intact," and that but for the hemorrhage, there would have been no middle cerebral artery stroke and no injury to plaintiff.

Plaintiff's nursing expert, Gayle Huelsmann, R.N., testified that the standard of care for nurses was to avoid use of an IUPC in a patient with a low-lying placenta. She testified that if Nurse Welz was the person who ruptured Andrea's membranes and inserted the IUPC, she breached the standard of care for nurses. If she did not rupture the membranes and insert the IUPC, she breached the standard of care nevertheless by not going up the chain of command to advocate against rupture of the membranes and placement of the IUPC. If the plan of care included use of an IUPC, Nurse Welz breached the standard of care by not advocating for the procedure to take place in the appropriate setting, the operating room.

After discovery was taken, including the depositions of Dr. Russell, Nurse Welz, and the residents, Covenant moved for summary disposition pursuant to MCR 2.116(C)(10). Covenant argued that plaintiff had failed to produce competent evidence to support a factual finding that a Covenant nurse or a resident doctor had inserted the IUPC, failed to establish that Welz's not going up the chain of command with respect to placement of the IUPC was a proximate cause of plaintiff's injuries, and failed to establish that the resident doctors were agents of the hospital. Covenant also joined Dr. Russell's motion for summary disposition on the ground that plaintiff's nine-year delay in filing his medical malpractice claim constituted laches.

-4-

Subsequent to oral argument, the trial court granted Covenant's motion with regard to any allegations of vicarious liability based on the actions of Drs. Liamidi and Adegoke because plaintiff had put forth no evidence indicating that these physicians were involved in Andrea's care during the critical time or had placed the IUPC. With regard to Dr. Rathee, however, the court concluded that there was a genuine issue of material fact as to whether he had placed the IUPC, and in doing so, breached the standard of care. To reach this conclusion, the court relied on an interrogatory response from Dr. Russell stating that to the best of her knowledge, either she or the resident placed the IUPC, Dr. Russell's recollection in her deposition of a conversation she had outside "the room" with the resident, being Dr. Rathee, about how easily the IUPC went in, and testimony from Dr. Rathee that conflicted with that of Dr. Russell.[11] In addition, persuaded by testimony indicating that Andrea looked to Covenant for treatment, had no prior physician/patient relationship with Dr. Rathee, and was not explicitly informed that Dr. Rathee was not an employee of Covenant, the trial court also concluded that a genuine issue of material fact existed as to whether Dr. Rathee was an ostensible agent of Covenant.

With regard to Nurse Welz, the court ruled that genuine issues of material fact existed regarding whether she placed the IUPC and whether her failure to advocate against placement of the IUPC was a proximate cause of plaintiff's injuries. Observing that Welz's labor and delivery notes did not identify who performed the vaginal examination at 18:33:39 and inserted the IUPC 30 seconds later, the court opined that a juror examining these notes could reasonably infer that Welz may have inserted the IUPC. The court opined that considering this inference alongside Welz's plausible interpretation of her notes as indicating that Dr. Russell placed the IUPC created a question of fact as to who did insert the IUPC. The court further opined that, because a genuine issue of material fact existed regarding who inserted the IUPC, a genuine issue of material fact likewise existed as to whether whoever inserted it would have done so had Nurse Welz advocated against its use. The court rejected Covenant's argument that plaintiff's position called for Nurse Welz to diagnose Andrea's vasa previa and to substitute her judgment for Dr. Russell's judgment, which Covenant argued would be tantamount to practicing medicine without a license. The trial court also denied Dr. Russell's motion for summary disposition based on laches, finding that there had been delay in bringing the instant cause of action and that Covenant had suffered prejudice thereby, but that Covenant had failed to show that plaintiff lacked diligence in bringing the claim.

## II. ANALYSIS

### A. STANDARD OF REVIEW

---

[11] Specifically, the trial court referenced Dr. Rathee's deposition testimony stating that he did not insert the IUPC, he did not remember the conversation that Dr. Russell recalled having with a resident, and he would have gone straight to the operating room in response to the code pink, not to the labor and delivery room. Thus, the trial court found that there were disputed factual issues for the jury.

We review de novo a trial court's grant or denial of a motion for summary disposition. *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). Covenant brought its motion for summary disposition under MCR 2.116(C)(10). A motion brought under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999). In reviewing such motion, "a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). The court may not make findings of fact or weigh credibility. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson v Vanderkooi*, ___ Mich ___; ___ NW2d ___ Docket Nos. 156057, 156058, Issued July 30, 2018, slip op 6 (quotation marks and citation omitted). If the documentary evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, the trial court may grant the motion. *Maiden*, 461 Mich at 120; MCR 2.116(C)(10).

## B. ALLEGED BREACH BASED ON PLACEMENT OF THE IUPC

### 1. DR. RAJ RATHEE

Covenant's first issue on appeal essentially boils down to a "who did it" inquiry. Covenant contends the evidence establishes that Dr. Russell inserted the IUPC, and there is no competent evidence for a jury to conclude that then medical resident Dr. Rathee was the one who placed the IUPC. Based on a review of the evidence, we must agree with Covenant.

To establish a cause of action for medical malpractice, a plaintiff must establish:

(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. [*Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004); MCL 600.2912a (codifying the common-law elements).]

Plaintiff's medical expert testified that the standard of care required avoiding use of an IUPC, and that placement of the IUPC in Andrea was a breach of that standard. Viewing the evidence in the light most favorable to plaintiff, *Maiden*, 461 Mich 109, 120; 461 Mich 109 (1999), we conclude that the trial court erred in finding a *genuine* issue of material fact as to whether Dr. Rathee placed the IUPC.

The evidence upon which plaintiff relies in an attempt to create a factual question as to whether Dr. Rathee placed the IUPC, is purely speculative, and therefore, insufficient. See *Ghaffari v Turner Const Co*, 268 Mich App 460, 464; 708 NW2d 448 (2005) ("Speculation and conjecture are insufficient to create an issue of material fact."). Specifically, plaintiff points to the fact that the medical record did not specify who inserted the IUPC, and in her interrogatory answers, Dr. Russell stated that to the best of her knowledge, it was either herself or the resident

who inserted the IUPC. At best, this evidence reveals a fifty/fifty chance that a resident inserted the IUPC.

Dr. Russell testified at her deposition that she did not have a direct memory of who inserted the IUPC.[12] A review of the medical records did not assist her in recalling who placed it, and the medical records do not place Dr. Rathee in Andrea's room at the time of the events in question. It would amount to conjecture to conclude that Dr. Rathee inserted the IUPC because he was present at the hospital and conceivably could have placed it.[13] See *Libralter Plastics, Inc v Chubb Group of Ins Cos*, 199 Mich App 482, 486; 502 NW2d 742 (1993) ("A conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference"). Moreover, Dr. Russell testified that she assumes it was she who inserted the IUPC. She had a memory of walking out of the room[14] talking to the resident (Dr. Rathee) and discussing the insertion of the IUPC and how easily it went in without any resistance, which caused her to believe that she had to have performed it herself in order to form an opinion about how easily it went in.

Dr. Rathee testified during his deposition that he did not provide care for Andrea prior to responding to the code pink, that he did not place the IUPC, and that he did not know who did. He said that he first became involved with the case when the code pink was called, at which time he immediately went to the operating room to assist with the emergency cesarean section. Dr. Rathee insisted that his involvement in the matter was limited to providing assistance to Dr. Russell during the emergency cesarean section, dictating his intraoperative findings, and providing a few days of postoperative care to Andrea.

Although the credibility of Dr. Rathee's testimony is for the factfinder to determine, see *Skinner* 445 Mich at 161, plaintiff has not presented any non-speculative evidence to refute the testimony or to call Dr. Rathee's credibility into question. Nowhere in Nurse Welz's labor notes is there any suggestion that Dr. Rathee was in the labor room at any time, and the deposition testimony of plaintiff's parents does not indicate that Dr. Rathee was in the room when the IUPC was placed. Plaintiff's father, Christopher, testified that Dr. Russell and Nurse Welz were the only medical personnel in the room during placement of the IUPC. Christopher testified that he did not see who actually inserted the IUPC, as he had stepped away to the window while it was occurring, but once it was placed, he saw Dr. Russell and Nurse Welz at the foot of the bed between his wife's legs. Moreover, neither Christopher nor Andrea remembered Dr. Rathee. Christopher did not know if Dr. Rathee was male or female, did not recall having any

---

[12] As noted above, litigation ensued ten years after plaintiff's birth.

[13] Dr. Rathee testified that he had been trained to place an IUPC, and that he could do so if so instructed. But as noted later in this opinion, Dr. Rathee testified that he was never in Andrea's labor room before the cesarean section and there is no evidence to the contrary.

[14] It was not clear whether the conversation Dr. Russell recalled having with the resident at issue, Dr. Rathee, took place after she walked out of Andrea's room post IUPC insertion, or instead, after the emergency cesarean section had occurred.

conversations with him, did not recall Andrea's having any conversations with him, and did not recall whether Dr. Rathee provided any medical care to Andrea. Andrea remembered a male physician conducting a vaginal examine around midday (well before insertion of the IUPC at 18:34:09), but thought it might have been Dr. Adegoke.

In order to survive summary disposition on this issue, plaintiff had to set forth "specific facts at the time of the motion showing a genuine issue for trial." *Maiden*, 461 Mich at 122. Plaintiff set forth no such facts. Instead, he relied on Dr. Russell's initial speculation as to who could have done it and the fact that Dr. Rathee was physically at the hospital at the time. This is not sufficient to create a genuine issue of material fact that Dr. Rathee placed the IUPC. *Ghaffari*, 268 Mich App at 464. Viewing the record evidence in the light most favorable to plaintiff results in the ineluctable conclusion that plaintiff has not established a genuine issue of material fact for which reasonable minds could conclude that Dr. Rathee inserted the IUPC. See *Johnson*, ___ Mich ___, slip op 6. Consequently, Covenant is entitled to summary disposition with regard to plaintiff's claims based on this allegation against Dr. Rathee. See *Maiden*, 461 Mich at 120. Given our disposition of this issue, we need not address the trial court's ruling with respect to ostensible agency of the residents.

## 2. NURSE HEATHER WELZ

Covenant next contends that the trial court erred in finding a genuine issue of material fact with respect to whether Nurse Welz inserted the IUPC and thereby breached the nursing standard of care. Again, we agree.

The trial court concluded that a juror examining Nurse Welz's notes could reasonably infer that she inserted the IUPC because the notes do not indicate otherwise. However, to draw such an inference, the juror would have to ignore the evidence establishing that Dr. Russell was also in the labor room during insertion of the IUPC and to conclude without factual support that Nurse Welz could have placed the IUPC despite her lack of training in how to do so, her failure to have ever performed an IUPC insertion on any other patient, and in disregard of the hospital's policy establishing that nurses do not insert IUPCs.

There is ample, undisputed testimony indicating that Nurse Welz was not the only medical professional in the room when the IUPC was placed. Plaintiff's parents and Nurse Welz testified that Dr. Russell also was in the room. Christopher, plaintiff's father, testified that Dr. Russell explained the IUPC, held it in her hand, showed it to him and Andrea, and talked about inserting it into the birth canal. He also said that Dr. Russell was in Andrea's room for about half an hour before calling the code pink. This does not contradict Nurse Welz's "Dr. Russell in room" notation at 18:38, but it does call into question the reasonableness of interpreting the record to indicate that Dr. Russell had just then entered the room.

Christopher testified that Nurse Welz was with Dr. Russell at the foot of the bed after insertion of the IUPC. However, it would be mere conjecture to infer from this that Welz may have inserted the IUPC. See *Libralter Plastics Inc*, 199 Mich App at 486. Welz testified that she had never received training in how to place an IUPC and that she had never placed an IUPC. Dr. Russell, Dr. Rathee, and Nurse Cheryl Waldie, another labor and delivery room nurse, testified that nurses at Covenant do not place IUPCs. Certainly, a juror could discredit the

testimony of plaintiff's parents and the medical personnel. However, considering that the record contains no evidence that contradicts or calls their testimony into question, to reject the record evidence in favor of speculating that Welz could have inserted the IUPC merely because she was in the room would not be reasonable or realistic. Under plaintiff's paradigm, the jury could also decide that either Andrea or Christopher, who were also in the room, could have inserted the IUPC.

Thus even when viewed in the light most favorable to plaintiff, *Maiden*, 461 Mich at 120, the evidence relative to the question of whether Welz inserted the IUPC does not give rise to a reasonable inference that she might have inserted it. Stated differently, given that Welz was in the room when the IUPC was placed and the absence of documentary evidence identifying who placed it gives rise only to a conjecture that Welz might have placed the IUPC. See *Libralter Plastics Inc*, 199 Mich App at 486. Conjectures are insufficient to establish a genuine issue of material fact. *Ghaffari*, 268 Mich App at 464. The reasonable inference to which the record gives rise is that someone other than Welz inserted the IUPC.

In sum, plaintiff did not "set forth specific facts at the time of the motion showing a genuine issue for trial" regarding whether Welz inserted the IUPC, *Maiden*, 461 Mich at 121, and the reasonable inference that can be drawn from the evidence does not contradict Welz's explanation of her notes. Therefore, the trial court erred in denying Covenant's motion for summary disposition on plaintiff's claim that Nurse Welz breached the nursing standard of care by placing the IUPC.

## C. PROXIMATE CAUSE

Covenant next contends that the trial court erred in finding a genuine issue of material fact with respect to whether Nurse Welz's alleged breach of failing to activate the chain of command associated with placement the IUCP was a proximate cause of plaintiff's injuries. Once again, we must agree with Covenant.

Proximate causation between the defendant's alleged breach of the applicable standard of care and the plaintiff's alleged injuries is one of the elements a plaintiff must establish in order to prevail on a medical malpractice claim. *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995); see MCL 600.2912a. Plaintiff "must establish both factual causation, i.e., the defendant's conduct in fact caused harm to the plaintiff, and legal causation, i.e., the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017) (quotation marks and citation omitted). Establishing cause in fact generally requires showing that " 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Skinner*, 445 Mich at 163. Legal cause "normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id*. Generally, proximate cause is a jury question. *Nicholas v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002). If, however, "the facts bearing upon proximate cause are not in dispute and reasonable persons could not differ about the application of the legal concept of proximate cause to those facts," the issue is a question of law for the court to decide. *Paddock v Tuscola & Saginaw Bay R Co, Inc*, 225 Mich App 526, 537; 571 NW2d 564 (1997).

Plaintiff's medical expert, Dr. Soffer, testified that the presence of a vasa previa contraindicated use of an IUPC because of the high risk that threading the catheter up into the uterus could perforate the communicating vessels and result in substantial bleeding. Review of the record reveals no evidence indicating that Nurse Welz knew or should have known about the vasa previa. In fact, Huelsmann, plaintiff's nursing expert, affirmed that the information available to Welz on the date of plaintiff's delivery did not include the ultrasound reports that Dr. Soffer relied upon in concluding that Andrea had vasa previa, nor was there mention in the records of either vasa previa or an accessory lobe.[15] Thus, there is no evidence that Welz possessed information about the vasa previa that, had she conveyed it to Dr. Russell, might have required Dr. Russell to avoid use of the IUPC.[16]

Even if Nurse Welz did not know about the vasa previa, Huelsmann testified that she had information that should have caused her to advocate against the IUPC's placement anyway. Huelsmann asserted, and Welz affirmed, that she knew from the records sent from Dr. Russell's office that Andrea had a low-lying placenta, that this was a post-date delivery, that labor was being induced, and that the baby's head was at a high station.[17] However, no record facts indicate that, had Welz advocated against use of the IUPC for any, or all, of these reasons, Dr. Russell would have changed her plans to attempt a vaginal delivery. The record shows that Dr. Russell already was fully aware of these conditions. She testified that she had documented plaintiff's low-lying placenta and her low risk for bleeding, and that she was unaware of any prohibitions against using an IUPC with a low-lying placenta. As Andrea's obstetrician, she obviously knew that Andrea's gestation period exceeded 40 weeks. She also ordered the induction, and her progress notes indicate that she knew the baby's head was at a high station prior to placement of the IUPC. Thus, the record indicates that Dr. Russell knew and took into account the information that Welz possessed, and there are no facts suggesting that Dr. Russell would not have placed the IUPC had Welz advocated against its use.

Furthermore, there is no expert testimony opining that had Nurse Welz gone up the chain of command and advocated against use of the IUPC based on the information she possessed, the result *should* have led to a decision not to use the IUPC. See *Martin v Ledingham*, 488 Mich 987; 791 NW2d 122 (2010) (holding that a genuine issue of material fact regarding proximate cause existed where, despite averments by the plaintiff's physicians that additional information would not have caused them to alter their treatment plan, the plaintiff's medical expert testified that if nurses had informed physicians of the plaintiff's worsening condition, the resulting

---

[15] Even if the information available to Welz did identify an accessory lobe, Dr. Soffer stated that the mere existence of an accessory lobe does not necessarily contraindicate the use of an IUPC; the dispositive fact is the position of the lobe relative to the main body of the placenta and the cervix.

[16] As we indicated above, there is no genuine issue of material fact that Dr. Rathee or Nurse Welz inserted the IUPC. Dr. Russell is the only person for whom there is any factual evidence to support a finding that she inserted the IUPC.

[17] That is, the baby's head had descended only minimally into Andrea's pelvis.

standard of care would have required the physicians to adopt a different course of treatment). With regard to the baby's placenta, Dr. Soffer testified that it was not technically "low-lying," and that it was not close enough to the cervix to cause concern. He did not testify that the position of the placenta relative to the cervix contraindicated use of an IUPC or contributed to plaintiff's injuries. Nor did he testify that, had Welz advocated against use of the IUPC based solely on the position of the placenta relative to the cervix, Dr. Russell's plan of treatment should have changed to exclude use of the IUPC. Dr. Soffer referred to the fact that delivery was post-date and labor was by induction in the context of opining that Dr. Russell should have delivered plaintiff by elective cesarean section. However, nothing in his testimony indicates that had Welz advocated against use of the IUPC for these reasons alone, the standard of care would have required a different treatment plan and produced a different outcome. Lastly, although Dr. Soffer refers several times in passing to the station of plaintiff's head during labor, his references are unrelated to use of the IUPC or to plaintiff's injuries.[18]

In sum, plaintiff's nursing expert testified to various factors she thought should have required Nurse Welz to activate the chain of command and advocate against placement of the IUPC. At best, plaintiff has set forth a "but for" factual causation argument: had Nurse Welz put a stop to the insertion of an IUPC, for whatever reason, plaintiff's injuries would not have occurred. However, the record fails to establish legal causation arising out of Welz's alleged nursing negligence. The record is clear that Dr. Russell was aware of all of Andrea's medical conditions deemed noteworthy by Huelsmann, and there is no testimony that any of those conditions considered apart from knowledge of the vasa previa would have required Dr. Russell, or anyone else, to avoid using the IUPC. Thus, even if Welz had gone up the chain of command advocating against use of the IUPC because of the low-lying placenta, the post-date delivery, the induction of labor, and the position of the baby's head, there is no expert testimony indicating that her advocacy would have required a change in the delivery plan or changed the outcome for plaintiff. Thus, the trial court erred in denying Covenant's motion for summary disposition on the issue of whether Welz's failure to activate the chain of command was a proximate cause of plaintiff's injuries. In light of our disposition of this issue, it is not necessary for us to address Covenant's contention that the duty alleged by plaintiff's nursing expert would require the unauthorized practice of medicine by a registered nurse.

## D. CONCLUSION

Because plaintiff failed to present evidence establishing a genuine issue of material fact as to whether either Dr. Rathee or Nurse Welz inserted the IUPC and as to whether Nurse Welz's alleged failure to activate the chain of command proximately caused plaintiff's injuries, Covenant was entitled to summary disposition in this matter. In light of our conclusion, we need

---

[18] Although plaintiff argues that Nurse Welz also breached the standard of care by failing to at least advocate for placement of the IUPC in the operating room, rather than in the labor room, there is absolutely no record evidence or expert testimony indicating that taking Andrea to the operating room for placement of the IUPC would have affected the outcome.

not address Covenant's additional argument regarding laches.[19]  Accordingly, we reverse the trial court's order denying Covenant's motion for summary disposition and remand the matter to the trial court for further proceedings with respect to the remaining defendant, Dr. Russell.

Reversed and remanded.  We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Michael J. Riordan
/s/ Thomas C. Cameron

---

[19] Were we to address this issue, we would find it without merit.